UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BARRY E. KOT, <br><br> Plaintiff, <br><br> v. <br><br> HUHTAMAKI, INC., <br><br> Defendant. | Civil Action No. |

**COMPLAINT**
**JURY TRIAL REQUESTED**
<u>**INJUNCTIVE RELIEF REQUESTED**</u>

NOW COMES the Plaintiff, Barry E. Kot ("Kot"), by and through undersigned counsel, and complains against the Defendant, Huhtamaki, Inc. ("Huhtamaki"), as follows:

<u>INTRODUCTION</u>

1.  This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 et seq., the Maine Whistleblowers' Protection Act ("MWPA") 26 M.R.S. §§ 833 et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq.

<u>PARTIES</u>

2.  Kot is a United States citizen residing in Oakland, Maine.

3.  Huhtamaki is a global manufacturer of consumer and specialty packaging with a head office in Espoo, Finland.

4.  Huhtamaki operates about 61 manufacturing units worldwide with about 17 in the United States including one in Waterville, Maine.

5.  Huhtamaki had 20 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the discrimination occurred.

1

6. More specifically, Huhtamaki employs about 14,400 employees in 30 countries.

7. Huhtamaki engages in industry affecting interstate commerce.

8. There is at least $75,000 in controversy in this matter.

9. There is diversity of citizenship between Plaintiff and Defendant for purposes of 28 U.S.C. § 1332.

## JURISDICTION

10. This Court has subject matter jurisdiction over Kot's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

11. On or about November 13, 2013, Kot filed a timely Charge of Discrimination against Huhtamaki alleging unlawful disability discrimination, retaliation and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

12. On or about July 22, 2014, the MHRC issued a Notice of Right to Sue with respect to Kot's state law claims.

13. On or about July 11, 2014, the EEOC issued a Notice of Right to Sue with respect to Kot's federal law claims.

14. Kot has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

## FACTUAL ALLEGATIONS

15. In August 2013, Respondent Huhtamaki Inc. offered Kot a job as a Machine Operator conditioned on a pre-employment physical.

16. After learning through the examination that Kot had controlled epilepsy and after Kot engaged in activity protected by the ADA, MHRA, and MWPA, Huhtamaki withdrew the job offer in violation of the MHRA and ADA.

17. Huhtamaki's Human Resources Manager in Maine is Beth Drennen Bates.

18. Huhtamaki's Safety Director in Maine is John Perry.

19. Huhtamaki has a contractual relationship with MaineGeneral Hospital Workplace Health ("Workplace Health") to provide medical services.

20. Workplace Health conducts Huhtamaki's pre-employment physicals for new employees in Maine. Susan Cruz, NP, is one of the providers.

21. Workplace Health also provides on-site medical services for Huhtamaki at the Waterville, Maine location. Christine Bouchard, RN, is the Nurse Coordinator who works on-site.

22. On or about August 7, 2013 Kot applied for a Machine Operator position at the Waterville, Maine location posted by Huhtamaki.

23. Kot was qualified to perform the essential functions of the job with or without reasonable accommodations.

24. Kot had a substantial amount of relevant experience for the job. He worked as a Machine Operator/Material Handler at an Owens Corning facility from June 2007 to August 2012. He worked as a Packer/Pallet Wrapper for Jarden Plastics Solutions for about three months in 2013. When Kot applied for a job at Huhtamaki, he had been working as a Warehouse Associate for Johnny's Selected Seeds since June 2013. Kot was well-qualified for the job with Huhtamaki.

25. Kot interviewed for the job on Monday, August 12, 2013 with Ms. Bates and Mr. Perry.

26. Ms. Bates subsequently contacted Kot's references who provided positive feedback. Bill Cotter said that Kot was a "great worker" and that he "wanted [Kot] to work for

3

his company." Kot's former supervisor at Owens Corning said that he was "dependable" and that he would "absolutely" rehire him.

27. Shortly thereafter, Ms. Bates offered Kot a job as a Machine Operator conditioned on a pre-placement physical with Workplace Health.

28. As instructed, Kot appeared at Workplace Health on Monday, August 19, 2013 for the physical which was conducted by Ms. Cruz.

29. Kot was asked to perform various tasks to determine his ability to perform the physical duties of the job. Kot had no difficulty performing the tasks.

30. Ms. Cruz asked Kot about his past medical conditions and medications.

31. Kot told Ms. Cruz that he had some seizures in 2005. Kot explained the seizures almost always occurred while he was sleeping and that in 2005 he did have some partial seizures (meaning that he would not lose consciousness or lose control of his body) during the day. Kot told Ms. Cruz that when he started having the partial seizures he was treated by a neurologist who prescribed an anti-seizure medication. Kot told Ms. Cruz that he had been seizure free since beginning the medication regimen eight and a half years earlier.

32. Ms. Cruz responded by telling Kot that she could not release him to perform the job stating, "What if you have a seizure and fall on a machine?"

33. Kot explained that his seizures were well controlled.

34. Kot pointed out that under Maine regulations, he was permitted to have a driver's license and that he had had a driver's license for the last eight years and drove on a daily basis without any issue.

35. Kot also explained that his neurologist annually submitted paperwork to the State indicating that his epilepsy was controlled.

36. Ms. Cruz stated that she disagreed with the State of Maine allowing people with a history of seizures to drive even if they were seizure free for a certain amount of time.

37. Kot also pointed out that he had performed the duties required at Huhtamaki at his current job and at jobs he had performed since his seizures were controlled.

38. Ms. Cruz seemed unconvinced so Kot brought up the fact that many people have heart conditions and diabetes and they are able to control those conditions with medications and his epilepsy was the same thing.

39. Ms. Cruz repeatedly referred to Kot's epilepsy as a "disability."

40. Ms. Cruz kept stating that she could not get past "what if" he had a seizure and that if he did it would be on her conscience.

41. Ms. Cruz asked Kot to have his neurologist fax over his medical records, blood tests, and the Bureau of Motor Vehicle paperwork sent to the State and she would review it. Kot agreed and had the paperwork faxed to Workplace Health the same day.

42. At the end of the Workplace Health examination Kot had some hope that after seeing the records which indicated that his epilepsy was well controlled that Ms. Cruz would clear him to start work at Huhtamaki without restrictions that would prevent him from working as a Machine Operator.

43. Later in the day on August 19, 2013, Kot called and spoke with Ms. Bates in Human Resources and explained what had occurred during his pre-employment physical. Kot told Ms. Bates that he had disclosed to Ms. Cruz that he had controlled epilepsy. Kot also told Ms. Bates that Ms. Cruz had indicated that she would not be releasing him in light of his epilepsy even though it was controlled. Ms. Bates told Kot "not to sweat the small stuff."

44. Kot called Workplace Health on Tuesday August 20th to check on the status of his examination but did not hear back from Ms. Cruz.

45. On around Wednesday, August 21st Kot spoke with Ms. Cruz by phone and asked about the status of his examination. Ms. Cruz told Kot that she had not yet reviewed the paperwork and so would need to get back to him. She also told Kot that she would make a decision and then communicate it to Huhtamaki.

46. The Fitness for Duty Evaluation signed by Ms. Cruz which was submitted by Huhtamaki to the Maine Human Rights Commission is dated August 19, 2013. The date on that document is at odds with Ms. Cruz's statement to Kot on August 21st (that she had not yet reviewed his neurologist's records and made a decision).

47. This could mean that Ms. Cruz made up her mind on August 19, 2013 before reviewing the medical records or that Ms. Cruz backdated the evaluation on or after August 21st.

48. Kot spoke to Ms. Cruz again on Monday, August 26, 2013. She told Kot that she had discussed his case with her supervisor and that she would be releasing him to work at Huhtamaki with restrictions. The restrictions Ms. Cruz listed included no working at heights, no working on catwalk, no working with large machinery, and no driving a forklift or tractor.

49. Kot explained to Ms. Cruz that the restrictions would disqualify him for the Machine Operator job.

50. Ms. Cruz knew this and confirmed that she had discussed these restrictions with the nurse who worked on-site at Huhtamaki (presumably Ms. Bouchard) and confirmed that they had no jobs that could accommodation those restrictions.

51. Kot felt that Ms. Cruz had gone beyond the scope of the examination and that she was basing her conclusions on unfounded fears and stereotypes about his epilepsy. Mr. Kot was upset that Ms. Cruz was taking actions that would exclude Kot from the Machine Operator job because of his history of epilepsy, which he believed to be illegal.

52. Kot told Ms. Cruz that he was going to look into legal action because he believed that he had been wronged and that she had gone beyond the scope of the exam.

53. Kot again brought up facts that he had discussed with Ms. Cruz during the examination on August 19th: that he had not had any issues in the past performing the duties of the job, that he had never had issues when he had undergone past pre-employment physicals, that he had had a driver's license for years and that State of Maine regulations permitted him to drive.

54. Ms. Cruz responded that the DOT [Department of Transportation] regulations for commercial drivers did not permit persons with controlled epilepsy to drive commercial vehicles.

55. Kot explained that he was not talking about driving a truck or a plane but instead was being evaluated to work in a factory.

56. Ms. Cruz told Kot that she would bring up his case with the board of her organization. Workplace Health apparently refers to this board as the "provider meeting."

57. Kot responded that he did not see what good that would do since they would almost certainly just back her up and that a real second opinion would be from someone totally different and independent.

58. Ms. Cruz asked Kot if he wanted her to bring up the case with the Board and he said, "Go ahead but I don't see that it is going to do me any good."

59. At no time during his conversation with Ms. Cruz on August 26th or at any other time did Kot swear at Ms. Cruz.

60. Ms. Cruz called Kot back later and stated that the board had agreed with her regarding the work restrictions she proposed. Kot responded, "No kidding, really," and went on to say that he would be talking to a lawyer. Ms. Cruz's notes from that conversation include the following:

"I called [Kot] back to explain that I am concerned about his safety while working at Huhtamaki. The job description syas (sic) "moderate likelihood of significant injury from moving objects," and "this is a risk with the combination of his seizure disorder and the stress of shift work and heat/humidity at Huhtamaki…"

61.    Kot was just as frustrated and angry with Ms. Cruz during this telephone call as he was during the call on August 26th. As before, Kot did not use profanities or threats when speaking to Ms. Cruz.

62.    Between August 26 and September 9, 2013, Huhtamaki and Workplace Health fabricated reasons for withdrawing Kot's job offer due to his epilepsy.

63.    On about August 26, when Ms. Cruz discussed Kot's case at the Workplace Health provider meeting, "Denise[1]" "suggested making sure that they have a solid job description. This strongly suggests that Ms. Cruz did not have a description for the job sought by Kot when she performed his evaluation.

64.    On about August 27, Ms. Cruz and Nurse Coordinator Bouchard spoke with Safety Officer Perry and he promised to "provide JSA [job safety analysis] information on a machine which explains it is machinery."

65.    The job description that Ms. Bouchard had as of August 28, 2013 showed "the need for working on uneven surfaces and moderate risk of traumatic injury," language which does not appear in the job descriptions submitted by Huhtamaki to the Maine Human Rights Commission.

66.    Ms. Bouchard wrote that the job description she had "supports [Ms. Cruz's] recommendations." This demonstrates that after-the-fact efforts were made to bolster decision to withdraw Kot's job offer due to his controlled epilepsy.

---

[1] "Denise" is probably Denise Dumont-Bernier, the Physical Therapy Director for Workplace Health.

67. Ms. Bouchard sent all of the above-referenced information to Huhtamaki managers Ms. Bates and Mr. Perry by email on August 28, 2013.

68. On September 3, 2013, Ms. Bates met with Ms. Bouchard and Ms. Cruz "to discuss what occurred." That conversation would have included a discussion about Kot's epilepsy and his protected activity in opposing disability discrimination.

69. Kot next communicated with Ms. Bates by telephone on about Friday, September 6, 2013. Ms. Bates told Kot that the company had to go with the medical provider's recommendations and that he was not being hired in light of the work restrictions established by Ms. Cruz. Ms. Bates did not mention anything to Kot about "profanities" or "threats."

70. On September 9, 2013 Kot emailed Ms. Bates and asked that she put in writing what she had indicated earlier about withdrawing his job offer because of Ms. Cruz' restrictions. She responded and indicated:

> "It was reported to Huhtamaki that on Monday, August 26, 2013, you spoke with Susan Cruz, NP, and she explained the restrictions she had for you regarding not working on large machinery, no catwalks and no fork lift driving. You responded to her using profanities and threats. Due to the discourteous and disrespectful interaction with the staff at Maine General, we are not able to offer you employment."

71. This explanation was new and different from what she had indicated to Kot earlier.

72. Kot did not use profanities in any conversation with Ms. Cruz. Kot was upset that he was being discriminated against and explained that he believed that what she was doing was illegal. Kot did not make any threats except to tell Ms. Cruz that he would be speaking with a lawyer about addressing the violations of his rights as set out above.

73. Neither Ms. Bates nor anyone else at Huhtamaki every interviewed Kot regarding his August 26, 2013 telephone conversation with Ms. Cruz or asked Kot whether he had used "profanities and threats" during his August 26, 2013 telephone conversation with Ms. Cruz.

74. The "threats" referred to in Ms. Bates' email constitute Kot's protected activity in opposing the discrimination against him on the basis of his disability and his statement that he would talking to a lawyer about the discrimination.

75. Prior to 2005 Kot would periodically sleep walk and have no memory of the sleep walking and understood that this was a type of seizure. In 2005 Kot began to have partial seizures during the day. He would not lose consciousness or lose control of his body but would become temporarily confused.

76. After Kot began having the partial seizures he treated with a neurologist who prescribed anti-seizure medication for him. After beginning the anti-seizure medications Kot's seizures stopped and he has not had a seizure since. Kot continues to take the anti-seizure medication to the present. In addition, Kot has annual checkups with a neurologist and each year the neurologist sends paperwork to the State Bureau of Motor Vehicles which permits him to obtain a driver's license.

77. At all material times Kot has worked, often in machine operator positions, and his controlled epilepsy has never affected his ability to perform the duties of his job or perform them safely.

78. Kot's epilepsy is a per se disability under the MHRA.

79. Kot's epilepsy is a disability under the ADA since, when viewed in its unmitigated state (i.e. without medications) it would significantly impair health and substantially limit major life activities including concentration.

80. Huhtamaki and its medical contractor regarded Kot as a person with an impairment and a disability as evidenced by their reaction to his disclosure of his epilepsy and withdrawal of their job offer after learning of his epilepsy.

81. Kot's statement to Ms. Cruz, Huhtamaki's medical contractor, that he believed that precluding him from the Machine Operator job because of his controlled epilepsy was wrong and illegal and that he would be contacting a lawyer about taking legal action constituted protected activity for purposes of the MHRA, ADA, and Maine Whistleblowers' Protection Act ("MWPA").  In particular, Kot reported what he reasonably believed to be a violation of state and federal law and was opposing this violation of his rights.

82. There is direct evidence in this case that Huhtamaki withdrew Kot's job offer because of his disability and because Huhtamaki regarded Kot as a person with a disability.

83. There is also direct evidence in this case that Huhtamaki withdrew Kot's job offer in retaliation for reporting and opposing the disability discrimination in this case as evidenced by Huhtamaki's admission that it terminated Kot, in part, for threatening to assert his rights to be free from discrimination.

84. The timing of the decision to revoke Kot's job offer and animus of Huhtamaki and its medical examiner evidences discrimination and retaliation.

85. The reason provided by Huhtamaki for Kot's termination is false and pretextual which is evidence that Huhtamaki is dissembling the facts to cover up a discriminatory and unlawful termination.

<u>COUNT I: MHRA</u>

86. Paragraphs 1-85 are incorporated by reference.

87. Huhtamaki's conduct violates the MHRA.

## COUNT II: ADA

88. Paragraphs 1-87 are incorporated by reference.

89. Huhtamaki's conduct violates the ADA.

## COUNT III: MWPA

90. Paragraphs 1-89 are incorporated by reference.

91. Huhtamaki's conduct violates the MWPA.

## PRAYER FOR RELIEF

Kot respectfully requests that the Court grant the following relief:

(a) Declare the conduct engaged in by Huhtamaki to be in violation of his rights;

(b) Enjoin Huhtamaki, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

(c) Order Huhtamaki to re-hire Kot for the position of Machine Operator;

(d) Award equitable relief for back pay, benefits and prejudgment interest;

(e) Award compensatory damages in an amount to be determined at trial;

(f) Award punitive damages in an amount to be determined at trial;

(g) Award nominal damages;

(h) Award attorney's fees, including legal expenses, and costs;

(i) Award prejudgment interest;

(j) Permanently enjoin Huhtamaki from engaging in any employment practices which discriminate on the basis of disability;

(k) Permanently enjoin Huhtamaki from entering into contractual or other arrangements or relationships that have the effect of subjecting qualified applicants with a disability to the discrimination prohibited by the MHRA and ADA.

(l) Require Huhtamaki to mail a letter to all medical employees and contractors notifying them of the verdict against them and stating that Huhtamaki will not tolerate discrimination in the future;

(m) Require Huhtamaki to post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

(n) Require Huhtamaki to train all management level employees on the protections afforded by the MHRA, ADA and MWPA;

(o) Require Huhtamaki to place a document in Kot's personnel file which explains that Huhtamaki unlawfully rescinded the job offer in September 2013 because of disability discrimination and retaliation; and

(p) Grant to Kot such other and further relief as may be just and proper.

Dated: July 24, 2014

/s/ Chad T. Hansen
chansen@maineemployeerights.com

/s/ Peter Thompson
pthompson@maineemployeerights.com

Attorneys for the Plaintiff

MAINE EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343